# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                      **Case No. 3:20cr18/MCR**

**MICHAEL JOE GREEN, II,**

      **Defendant.**

_____/

## ORDER

This matter is before the Court on a Motion to Suppress Evidence by Defendant Michael Joe Green II, *see* ECF No. 19, which the Government opposes, *see* ECF No. 20.  The Court held an evidentiary hearing on June 18, 2020 and took Green's motion under advisement.  Having fully and carefully considered the evidence, the applicable law, and the written and oral arguments of the parties, the Court denies the motion.

Green is charged with one count of possession of a firearm and ammunition[1] by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  Trial is scheduled for August 3, 2020.  Pursuant to Federal Rule of Criminal Procedure 12(b)(3), Green

---

[1] Specifically, Count One charges Defendant with knowingly possessing a Canik 9-millimeter pistol and Aguila 9 x 19 millimeter ammunition on January 18, 2020.

moves to suppress the firearm and ammunition as "fruit of an illegal stop of his automobile and detention of his person." ECF No. 19. More specifically, Green argues that law enforcement officers did not have the requisite reasonable suspicion to stop his vehicle and detain him, and therefore the firearm and ammunition found inside his car are inadmissible. The Government responds that the seizure of firearm and ammunition from Green's vehicle was the result of a traffic stop supported by both reasonable suspicion and probable cause.

## I.   Background

The sequence of events leading up to and following Green's traffic stop is not in dispute. Security footage shows that on January 18, 2020, at approximately 2:47 a.m., Green pulled into a well-lit public parking lot at the northwest corner of Jefferson Street and Government Street in downtown Pensacola and reverse-parked his black Cadillac sedan into a parking spot along the perimeter, such that the front of the vehicle faced into the parking lot as opposed to the street. It was Gallery Night, a lively, monthly celebration of the local culture, so a number of cars were circling in and out of the parking lot, and there were a lot of people out and about. Green was seated in the driver's seat, and John McNeil was in the front passenger seat. Less than ten minutes later, a Pensacola Police Department officer, Officer Charles Restifo, approached Green from the driver's side window and spoke to him for approximately one minute. As Officer Restifo walked away, Green started

driving towards the parking lot's exit.  But before he could reach Jefferson Street, a marked police vehicle pulled in front of Green, blocked the exit, and turned on its blue lights.  Green and McNeil were subsequently removed from the vehicle and placed in handcuffs.  Either simultaneously or shortly thereafter, Officer Restifo observed a visible firearm under the driver's seat.  Approximately 25 minutes later, a canine sniff was conducted, which signaled the presence of narcotics.  Green and McNeil were arrested.  A search of the vehicle by Alcohol, Tobacco, and Firearms agents on the scene uncovered an open, partially empty bottle of Patrón tequila, a plastic cup containing a cocktail straw in the center console of the vehicle, an ashtray containing several smoked or fully smoked marijuana blunts, and a small plastic bag containing 3.8 grams of fresh marijuana.  Presumably, the firearm that Officer Restifo observed under the driver's seat was also collected during the search.[2]

The parties dispute what was observed in and around Green's car before the traffic stop.  At the hearing, the Government presented testimony from several Pensacola Police Department detectives and officers, including two detectives from the VICE and narcotics unit, Detectives Mark Norman and Richard Ghigliotty, and one patrol officer, Officer Restifo.  All three law enforcement officers encountered

---

[2]      A photograph of the firearm was not admitted into evidence and no witness testified to when the firearm was seized.

Green and his vehicle within ten minutes prior to the traffic stop.[3]  Green presented

testimony from McNeil, the sole passenger in Green's vehicle immediately before

and at the time of the traffic stop.[4]  The Court summarizes the relevant testimony

below.

Pensacola Police Department Detective Mark Norman was the first law

enforcement official to encounter Green.  Detective Norman and Detective Richard

Ghigliotty[5] were patrolling the area that night in plain clothes and are seen on

security footage walking south through the parking lot, in the direction of Green's

car.  Detective Norman testified that as he was walking through the parking lot, he

observed Green in the driver's seat of a parked black Cadillac, with the window

rolled down.  Detective Norman recognized Green from an intelligence bulletin he

had reviewed with other Pensacola Police Department officers prior to his patrol that

night.  The bulletin, reviewed in preparation for the upcoming Martin Luther King,

---

[3]     The Government also presented testimony from Detective Amanda Davis of the Pensacola
Police Department and Special Agent Adam Zeithammel of the Bureau of Alcohol, Tobacco, and
Firearms and Explosives.  Both witnesses provided testimony regarding events immediately
following the traffic stop.  The Government also introduced security camera footage of the parking
lot where Green's encounter with law enforcement took place.

[4]     Green also presented testimony from Maasin Wallace, an investigator for the Federal
Public Defender's Office, regarding his interview with one of the arresting officers, Officer
Wayne Berthiaume of the Pensacola Police Department.  Additionally, Green introduced into
evidence body camera footage from Officer Berthiaume after he had stopped Green's vehicle.

[5]     Detectives Norman and Ghigliotty were also accompanied by a third law enforcement
officer, who Special Agent Adam Zeithammel of the Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF") identified as Special Agent Matthew Murray.  Special Agent Murray did not
testify at the evidentiary hearing.

Jr. parade, provided intelligence on several individuals who were suspected of being involved in recent violent crimes in Pensacola, and contained photographs of those individuals, including Green.

Detective Norman separated from Detective Ghigliotty and approached the front driver's side several feet in front of the headlight of Green's vehicle, where he paused briefly and turned around to rejoin Detective Ghigliotty on the sidewalk. Detective Norman testified that when he stopped by the driver's side headlight, he could smell a "strong odor" of marijuana "emanating" from Green's vehicle. The security footage shows another vehicle[6] parked next to Green, but Detective Norman testified that the marijuana smell came from Green's vehicle only.

Thereafter, Detective Norman testified that he immediately walked north to two nearby uniformed officers, one of whom was Detective Amanda Davis of the Pensacola Police Department, and told her they needed to stop Green's vehicle. He did not tell the uniformed officers that he smelled marijuana emanating from Green's vehicle or otherwise explain why they needed to stop Green's car.[7] Officer Davis testified that in response, she radioed several other police officers to conduct a traffic

---

[6]     The security footage shows that the vehicle parked next to Green was facing the opposite direction, i.e. with the trunk facing Detective Norman. The driver's side window was also rolled down.

[7]     Detective Norman has served as a detective in the VICE and narcotics unit for approximately five years and has received specific training on detecting and identifying marijuana.

stop of Green's vehicle.

Approximately 10 seconds after Detective Norman started walking away from Green's vehicle, at 2:55 a.m., Officer Restifo approached Green's open driver's side window from the rear.  Officer Restifo, who was wearing a black vest with the word "POLICE" in large font across the front and back[8], was attempting to clear out the parking lot, and had just asked the occupants of the only vehicle parked next to Green's to exit the lot.  Officer Restifo testified that when he reached Green, he directed a flashlight into the vehicle and observed Green and McNeil with money fanned out across their laps.  Green said the money was "for the ladies," and asked Officer Restifo if he was free to leave, to which Officer Restifo responded he was.  Officer Restifo testified that he did not smell marijuana when he was at Green's vehicle and did not observe an open liquor bottle in the car.  Green then began driving away from Officer Restifo and towards the parking lot exit.  There were several other cars attempting to exit the lot, and Green's vehicle moved forward approximately one car length only before it reached a short standstill behind a line of vehicles attempting to exit.

As Green's car waited to proceed, Detective Ghigliotty became the third Pensacola Police Department official to encounter Green.  Detective Ghigliotty is

---

[8]     The surveillance video also shows Officer Restifo with a gun and holster strapped around his right thigh.

seen on the security footage walking north to south through the parking lot while appearing to be on his cell phone. He walked past Green's vehicle along the driver's side, stopped near Green's rear bumper to speak with two uniformed police officers, and then turned around and walked south to north, back alongside Green's car but on the passenger side. Detective Ghigliotty testified that as he walked by the driver's side of the car and peered inside the open driver's side window, he recognized Green from the same bulletin that Detective Norman reviewed prior to their patrol that night. Detective Ghigliotty also smelled burnt marijuana coming from the car, particularly as he walked back north along the passenger side.

While Green's vehicle inched towards the exit to the parking lot, Detective Norman and Detective Ghigliotty separately walked by Green's vehicle again. Detective Norman was first. He walked southwest across the parking lot, passing Green's car along the passenger side, but remained several feet away. Detective Norman testified that he continued to smell marijuana emanating from the car, through the closed passenger window.[9] Several seconds later, Detective Norman strolled past Green's car again, this time heading northeast, and testified that he caught another "overwhelming" odor of "fresh" marijuana coming from the car, this time with the passenger side window rolled down.

---

[9]     It is unclear in the surveillance footage whether the passenger side window was completely or only partially closed.

A couple of minutes later, when Green was in the exit lane about to leave the parking lot, Detective Ghigliotty walked by Green's vehicle for a second time. He walked in front of the car along the front bumper, and then turned right and walked immediately along the passenger side, heading west. Detective Ghigliotty testified that as he walked along the front bumper, he looked through the front windshield[10] and saw in the center console a clear plastic cup used by nearby bars to serve liquor and in Green's lap an open bottle of Patrón tequila. Detective Ghigliotty then called Sergeant Pat Bradley[11] and requested that he arrange for a stop of Green's car. Detective Ghigliotty told Sergeant Bradley that he "ha[d] enough" to stop the vehicle, but did not specifically mention the marijuana odor or open liquor bottle.[12]

As soon as Green reached the front of the exit lane, Officer Wayne Berthiaume pulled his marked police vehicle directly in front of Green's black Cadillac, blocking the exit. Detective Davis, who was nearby on foot, approached the driver's side of the vehicle and Officer Berthiaume approached the passenger side. The driver's side window was down, and Detective Davis immediately observed what appeared to be

---

[10]   According to Detective Ghigliotty and Detective Norman, the windows of Green's vehicle were not tinted.

[11]   Detective Ghigliotty testified that he believed Sergeant Bradley was the supervisor that night.

[12]   Maasin Wallace testified that when he interviewed Officer Wayne Berthiaume, one of the officers who conducted the traffic stop, Officer Berthiaume recalled that Detective Ghigliotty approached him in the parking lot briefly and instructed him to conduct the traffic stop. Officer Berthiaume could not recall whether he was told why Detective Ghigliotty wanted to stop the vehicle, but he nevertheless did receive a "green light" to proceed with the traffic stop.

an open bottle of Patrón.  She also observed Green fidgeting under his car seat and ordered him to show his hands several times.  Detective Davis instructed Green to exit the vehicle and advised him that he would be placed in handcuffs.  Detective Davis testified that she did not smell marijuana until she approached the open passenger side door and McNeil exited the vehicle.

McNeil testified he was unaware of any marijuana and did not see a bottle of Patrón in the car that night.  He denied any marijuana being smoked in the car the entire time he was in the passenger seat.  Additionally, although McNeil agreed there was a plastic cup in the center console, he recalled it being empty.

## II.   Discussion

"The Fourth Amendment protects individuals from unreasonable search and seizure." *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015).  A warrantless traffic stop is an unreasonable "seizure" that violates the Fourth Amendment, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), unless it is supported by probable cause to believe a traffic violation has occurred or reasonable suspicion of criminal activity.[13]  *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).

---

[13]    Here, there is no dispute that Green was "seized" when Officer Berthiaume used his patrol car to block Green's ability to exit the parking lot and Officer Davis subsequently removed Green from the car and placed him in handcuffs.  *See Brendlin v. California*, 551 U.S. 249, 255 (2007); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

Green argues that law enforcement did not have reasonable suspicion or probable cause to stop him, and thus his traffic stop was unconstitutional.[14]  In so arguing, he asks the Court to reject the testimony of Detective Norman and Detective Ghigliotty regarding their observations of a marijuana odor emanating from Green's vehicle and an open liquor bottle inside Green's vehicle.

The Court declines and instead finds (1) the detectives' testimony credible and (2) that the officers had both reasonable suspicion and probable cause to stop Green's car.

### a.  The Officers' Testimony Was Credible

District Court rulings on motions to suppress evidence "involve mixed questions of law and fact."  *United States v. Lewis*, 674 F.3d 1298, 1302 (11th Cir. 2012); *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).  When

---

[14]      Green does not challenge the constitutionality of the prolonged traffic stop or the subsequent search of his vehicle, but rather argues that the firearm and ammunition uncovered in the search were fruits of an illegal stop.  *See* Mot. to Suppress at 4.  In any event, the marijuana odor emanating from the vehicle also provided law enforcement with probable cause to search the vehicle without a warrant.  *See United States v. Dixon*, 901 F. 3d 1322, 1339 (11th Cir. 2018) (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir.1991) (en banc)) (holding that officer who testified that he "smelled the odor of marijuana" as he approached the vehicle had probable cause to search it); *see, e.g.*, *United States v. Clark*, 605 F. App'x 892, 895 (11th Cir. 2015) (affirming finding of probable cause to search vehicle without a warrant where officers smelled marijuana coming from defendant's car); *United States v. Smith*, 481 F. App'x 540, 544 (11th Cir. 2012) (same).  That the officers waited 25 minutes for drug-sniffing dogs to corroborate the smell does not render the length of the stop unconstitutional.  *See Holt*, 777 F.3d at 1257 (holding traffic stop constitutional where the officers had reasonable, articulable suspicions that the defendant was illegally transporting narcotics or currency and the stop lasted 27 minutes before a drug-sniffing dog was deployed).

opposing parties present conflicting testimony regarding questions of fact, the district court must evaluate which testimony is more credible, accounting for the interests of the witness, any internal consistencies in the witness's testimony and the witness's candor and demeanor on the stand. *Ramirez-Chilel*, 289 F.3d at 749. The district court's credibility determination is conclusive unless it appears to be "unbelievable," or "so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Holt*, 777 F.3d at 1255; *Ramirez-Chilel*, 289 F.3d at 749.

First, during their testimony, both Detective Norman and Detective Ghigliotty were professional, calm and courteous, which only adds to their credibility. *See United States v. Sims*, No. 9:19-CR-80106, 2019 WL 7879878, at *5 (S.D. Fla. Dec. 20, 2019) (finding testimony of deputy credible in part because his demeanor was "honest, professional, and courteous" on the witness stand).

Second, the testimonies of Detective Norman and Detective Ghigliotty were not only internally consistent, but also largely consistent with what could be observed on the security footage and what was eventually found in Green's vehicle: several fully and partially smoked marijuana cigarettes and approximately 3.8 grams of unburnt marijuana. *See United States v. Rembert*, No. 117CR00316MHCAJB, 2018 WL 7283630, at *11 (N.D. Ga. Dec. 6, 2018) (finding credible officer's statement that he smelled marijuana, in part because the search of the vehicle

uncovered unburned marijuana in a backpack).[15]

Third, the fact that both detectives have had extensive training and experience with marijuana in their law enforcement careers enhances their credibility with respect to identifying the odor of marijuana. *See United States v. Clark*, 605 F. App'x 892, 895 (11th Cir. 2015) ("The court did not clearly err in crediting the detectives' testimony that they could smell the scent of marijuana coming from [the defendant's] car, especially given that both detectives had made numerous narcotics arrests involving marijuana over the course of their careers."). Detective Norman has been in the VICE and narcotics unit for five years and has received specific training on detecting and identifying marijuana. He has also made at least several hundred marijuana related arrests in his law enforcement career. Similarly, Detective Ghigliotty is also in the VICE and narcotics unit. Although he joined the unit in December of last year, he has over five years of total law enforcement experience and has been involved in several hundred narcotics-related investigations, including marijuana.[16]

Moreover, although Green argues that Officer Restifo's testimony regarding

---

[15]    The fact that Detective Norman characterized the marijuana smell as "fresh" and Detective Ghigliotty characterized it as "burnt" does not render the testimony implausible, improbable, or unreasonably inconsistent. *See United States v. Reed,* No. 118CR00612KOBHNJ, 2019 WL 2710088, at *7 (N.D. Ala. May 3, 2019).

[16]    Detective Ghigliotty also testified that he was able to recognize the plastic cocktail cup and Patrón bottle based on his bartending experience at local bars in Pensacola.

the absence of any marijuana odor discredits the contrary testimonies of Detective Norman and Detective Ghigliotty, the Court does not agree.  In fact, the accounts of Detective Norman and Detective Ghigliotty are not necessarily inconsistent with Officer Restifo.   Detective Norman, Detective Ghigliotty, and Officer Restifo encountered Green at different times.  That Officer Restifo did not smell marijuana or see an open bottle of liquor in the car does not necessarily mean that Detectives Norman and Ghigliotty could not have smelled marijuana or that Detective Ghigliotty could not have seen an open Patrón bottle, particularly when they encountered Green's vehicle at different times.  Additionally, Officer Restifo never walked by the passenger side of vehicle, where both Detective Norman and Detective Ghigliotty found the marijuana odor most apparent, or the front of the vehicle, where Detective Norman first detected the marijuana odor.  Officer Restifo approached Green's vehicle from the rear on the driver's side, and walked up to only the driver's side window; he never past that point, and after his brief encounter with Green, Green drove away.  Furthermore, unlike Detective Norman and Detective Ghigliotty, Officer Restifo was not dressed in plain clothes, and instead sported a vest with clear law enforcement insignia.  Officer Restifo had been clearing out other cars across the parking lot before he crossed it and approached the vicinity of Green's vehicle to continue clearing out the lot.  Since Green's vehicle was reverse-parked such that the front faced into the parking lot, it is reasonable to infer that

Green and/or McNeil saw Officer Restifo clearing out the parking lot.  It is also reasonable to infer that when Green and/or McNeil spotted Officer Restifo, they hid the open Patrón bottle and tried to mask any marijuana smell inside Green's vehicle. Indeed, these inferences would likely explain why Detective Norman, who had walked by Green's vehicle several seconds before Officer Restifo, like Officer Restifo did not observe the Patrón bottle.  Thus, the testimony of Detective Norman and Detective Ghigliotty are not improbable or unbelievable on its face. Accordingly, the Court credits their testimony.  *See, e.g., United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010) (accepting district court's factual findings regarding marijuana smell because the fact that one officer remembered the marijuana smell and one did not recollect it did not make the existence of marijuana odors "inconceivable" or "unbelievable"); *United States v. Johnson*, 445 F. App'x 311, 313 (11th Cir. 2011) (affirming denial of motion to suppress where police officer's testimony regarding the smell of raw marijuana was credible and not inherently unbelievable); *United States v. Benitez*, 541 F. App'x 961, 963 (11th Cir. 2013) (finding no reversible error in crediting police officer's testimony when it "was not improbable or inconsistent on its face").

Lastly, the Court finds the testimony of Detectives Norman and Ghigliotty more credible than that of John McNeil.  McNeil testified he did not smell marijuana or see a bottle of Patrón in the car.  However, some of McNeil's testimony also

contradicts the video evidence.  For example, he testified that the police officers who stopped Green's car approached from the back, when the video clearly shows that they came from the police vehicle in the front and from the sidewalk on the driver's side.  McNeil also testified that he did not see a bottle of Patrón in the car.  But the body camera footage from Officer Berthiaume showed that Green picked up a bottle of Patron from his right armrest during his encounter with Officer Davis, all while McNeil was sitting next to Green in the passenger seat.  Additionally, McNeil was effectively impeached by the Government based on his prior criminal history.  *See* Fed. R. Evid. 609.  Finally, McNeil has a strong motive for disclaiming any knowledge or smell of marijuana in Green's car given that he is facing marijuana-related charges for the marijuana found in the car.

### b.  The Traffic Stop Was Constitutional

The Court next addresses whether the stop was justified by reasonable suspicion or probable cause.  Reasonable suspicion is a "less demanding standard than probable cause," and exists when the totality of the circumstances provides law enforcement with "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Lewis*, 674 F.3d at 1303, 1305; *see Ornelas v. United States*, 517 U.S. 690, 696 (1996).  Reasonable suspicion may draw from the collective knowledge of the law enforcement officers involved in the stop.  *United States v. Bishop*, 940 F.3d 1242 (11th Cir. 2019) (citing *United States v. Cotton*, 721

F.2d 350, 352 (11th Cir. 1983)); *see United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).  Probable cause is based on "the facts and circumstances within the *collective knowledge* of law enforcement officials, of which they had reasonably trustworthy information."  *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (emphasis added); *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992).  But the facts and circumstances must be "sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *Willis,* 953 F.2d at 1494; *Allison*, 953 F.2d at 1350.

Here, the officers involved in the stop had reasonable suspicion to stop Green. Detective Ghigliotty and Detective Norman had a particularized and objective basis for believing that Green's vehicle contained marijuana, which is illegal for recreational use in Florida, *see* Fla. Stat. §§ 893.02-893.03, when they detected marijuana odor coming from the car.  Detective Norman provided credible testimony that he detected a "strong" marijuana odor as he walked past Green's car three separate times.  Detective Ghigliotty similarly testified that he could smell marijuana coming from Green's car when he walked by twice.  It is well-established in this Circuit that the smell of marijuana provides reasonable suspicion of criminal activity.  *White*, 593 F.3d at 1203; *United States v. Hunter*, 373 F. App'x 973, 976 (11th Cir. 2010).  The detectives did not need to physically see the marijuana or observe Green recreationally using marijuana to stop him; the marijuana odor is

sufficient for an objectively reasonable officer, particularly with the same level of training and experience with marijuana-related offenses as the detectives, to suspect that the vehicle's occupants were involved in criminal activity. *See United States v. Williams*, 619 F.3d 1269, 1271 (11th Cir. 2010) ([T]he law does not require absolute certainty or even probable cause before an officer stops a car; he need only reasonably suspect that its occupants are involved in criminal activity.").

There was also probable cause to stop Green for violating two traffic laws. Law enforcement "may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). This includes noncriminal traffic violations, even if it is an offense punishable by fine. *See, e.g., Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) (driving without highlights); *United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (littering); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding arrest was properly supported by probable cause to believe that the defendant violated a misdemeanor seatbelt requirement punishable only be a fine).

Detective Ghigliotty observed in Green's front seat an unsealed, half empty bottle of liquor and a plastic cup frequently used by surrounding bars—perhaps with even more frequency on Gallery Night—to hold cocktails as Green headed towards

the parking lot exit in his vehicle.  In Florida, it is unlawful for any person "to possess an open container of an alcoholic beverage . . . while operating a vehicle in the state." Fla. Stat. § 316.1936(2)(a).  Additionally, in Escambia County, where Green was stopped, it is "unlawful for any person to consume any alcoholic beverage or possess an open container of any alcoholic beverage while stopping, standing or remaining in or upon any public parking area when such area is open to the view of the general public or accessible to vehicular traffic."  Escambia County Code of Ordinances § 6-63.  Under both the Florida law and the Escambia County Ordinance, an "open container" is any container of alcoholic beverage that has a broken seal.  *Compare* Fla. Stat. § 316.1936(1)(a) ("open container" means "any container of alcoholic beverage which is immediately capable of being consumed from, or the seal of which has been broken"); Escambia County Code of Ordinances § 6-61 ("Open container means any bottle, can, cup, glass or other receptacle containing any alcoholic beverage which is open, which has been opened, which has its seal broken, or which has had its contents partially removed.").  Based on the totality of the circumstances, a reasonably prudent officer in Detective Ghigliotty's position would have probable cause to believe that Green was in violation of both Fla. Stat. § 316.1936(2)(a) and Escambia County Code of Ordinances § 6-63.

Although Detective Norman and Detective Ghigliotty did not physically conduct the traffic stop themselves, the traffic stop was nevertheless constitutional.

As the Court previously observed, reasonable suspicion and probable cause are determined from the *collective* knowledge of *all* officers involved in the traffic stop. *See Terrell*, 668 F.3d at 1251-52 (11th Cir. 2012) (citing *United States v. Hensley*, 469 U.S. 221, 231 (1985)); *Glinton*, 154 F.3d at 1257.  "Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause." *Allison*, 953 F.2d at 1350.  The same applies for reasonable suspicion.  *See, e.g.*, *Glinton*, 154 F.3d at 1257; *United States v. Guzman*, No. CV117CR00405TWTLTW2, 2018 WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018).  For example, in *Glinton*, the defendant, like Green here, argued that the initial traffic stop violated the Fourth Amendment because the officers who stopped him did not observe firsthand the reasonably suspect activity.  The Court rejected defendant's argument and found that there was reasonable suspicion for the stop where the task force agents who observed the reasonably suspect activity ordered the other officers, by radio, to stop the car.  *See Glinton*, 154 F.3d at 1249, 1257.

Here, Detective Davis and Officer Berthiaume, the two law enforcement officials who stopped Green, did not observe firsthand any marijuana odor or an open liquor bottle prior to the stop.  But they were directly instructed to conduct the stop by Detective Norman and Detective Ghigliotty, who did have reasonable suspicion and probable cause to stop Green.  That Detective Norman and Detective Ghigliotty may not have shared with the officers conducting the stop the precise

reason for conducting the stop does not preclude their knowledge from being considered as part of the shared, collective knowledge of the other officers involved in the stop. *See United States v. Kapperman*, 764 F.2d 786, 791 n.5 (11th Cir. 1985) (explaining that even though the arresting officer may not have known all the facts of the investigation, the collective knowledge of all officers involved provided probable cause for the arrest). Thus, collectively, the officers had sufficient justification to stop Green's car under the Fourth Amendment. *See Glinton*, 154 F.3d at 1257; *see also United States v. Burrows*, 566 F. App'x 889, 892 (11th Cir. 2014) ("In reaching the conclusion that reasonable suspicion supported an investigatory stop, the district judge did not err in assessing the collective knowledge of all officers at the time [defendant was stopped].").

Green also argues that he was specifically targeted by the officers because he appeared in the evening's intelligence bulletin. But both Detective Norman and Detective Ghigliotty denied having any ulterior motives for the stop. In any event, an officer's subjective motivations "play[s] no role in ordinary, probable-cause Fourth Amendment analysis," *Whren v. United States*, 517 U.S. 806, 810-13 (1996), and thus "does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment," *Harris*, 526 F.3d at 1337. *See United States v. Holloman*, 113 F.3d 192, 194 (11th Cir. 1997) (holding that police officers' subjective intent in conducting the traffic stop did not invalidate seizure of defendant and his vehicle

where officers had probable cause to believe that a traffic violation occurred).

For the foregoing reasons, the Court concludes that the Pensacola Police Department detectives and officers who stopped Green's vehicle had both reasonable suspicion and probable cause to stop and detain him.  Accordingly, Defendant's Motion to Suppress Evidence, ECF No. 19, is **DENIED**.

**DONE** and **ORDERED** this 20th day of July 2020.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**